**1384**

Sami S. HADDAD and Geraldine Haddad, Plaintiffs,

v.

SHELL OIL COMPANY, a corporation, et al., Defendants.

No. 76–2236–AAH.

United States District Court, C. D. California.

Dec. 28, 1976.

Richard P. Carroll, Anaheim, Cal., for plaintiffs.

Latham & Watkins by Max L. Gillam and Morris A. Thurston, Los Angeles, Cal., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAUK, District Judge.

Defendants' Motion for Summary Judgment came on for hearing before the Court, the Honorable Andrew A. Hauk, District Judge presiding, and the issues having been duly heard, the Court makes the following finding of facts and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff Sami Haddad ("Haddad"), during the period referred to in the complaint in this action and since 1967, has been a so-called "dealer" operating various gaso-

line service stations owned or leased by Defendant Shell Oil Company ("Shell") in the San Fernando Valley area of Los Angeles, California. Prior to his being installed at the automobile service station at 5556 Sepulveda Boulevard, Van Nuys, Haddad had operated other Shell service stations under a so-called "DLT lease," i. e. a dealer lease temporary. Such leases are of a temporary nature pending decisions by Shell as to what use is to be made of such stations.

2. Defendant Donald T. Gallagher ("Gallagher") is an employee of Shell but he is not a principal executive officer or director of Shell. Gallagher is now and has been since at least September 23, 1972, the Manager of Shell's Los Angeles District. In his capacity as an employee of Shell, Gallagher has had various telephone conversations with Haddad during the time period referred to in the complaint, virtually all of which have taken place when Haddad was at his places of business. Gallagher has made only two telephone calls to Haddad at his home, both being made between the hours of 4:30 p. m. and 6:30 p. m. The first such telephone call was in late 1974 when after unsuccessfully attempting to reach Haddad at his service station, Gallagher telephoned him at home to discuss Haddad's concerns relating to the service station at 5556 Sepulveda. The second such telephone call was in late April, 1976, when Gallagher attempted unsuccessfully to reach Haddad at his home.

3. The following findings of fact relate to Haddad's claims concerning the automobile service station at 5556 Sepulveda Boulevard, Van Nuys, California and 9070 Van Nuys Boulevard, Panorama City, California:

a) On September 23, 1972, Haddad and Shell entered into a "Dealer Lease" and a "Dealer Agreement," pursuant to which Shell agreed to sublease to Haddad a gasoline service station located at 5556 Sepulveda Boulevard, Van Nuys, California ("Van Nuys station"), and provide Shell products to Haddad at such station and Haddad agreed to pay rent to Shell and to operate such station as a Shell automobile service station. Each of such agreements contained an integration clause which provided that such agreement comprised the entire agreement between the parties and merged and superceded all prior agreements, representations and warranties (oral or written, express or implied) between the parties.

b) On June 11, 1975, Haddad and Shell entered into a "Dealer Lease" agreement and "Dealer Agreement" pursuant to which Shell agreed to sublease to Haddad an automobile service station located at 9070 Van Nuys Boulevard, Panorama City, California ("Panorama City station"), and Haddad agreed to pay rent to Shell and operate the premises as a Shell automobile service station commencing on August 15, 1975 for a term of one year. Each of such agreements contained an integration clause which provided that such agreements comprised the entire agreement between the parties and merged and superceded all prior agreements, representations and warranties (oral or written, express or implied) between the parties.

c) On August 13, 1975, Haddad and Shell entered into a "Termination Agreement" pursuant to which the above-referenced Dealer Lease and Dealer Agreement concerning the Van Nuys station were terminated and pursuant to which Haddad and Shell released each other from all claims which each might have against the other arising directly or indirectly under such agreements. Pursuant to such agreement, Haddad voluntarily vacated the premises of the Van Nuys station on or about August 13, 1975. Haddad executed such Termination Agreement voluntarily and was not induced to execute such Termination Agreement by any threat of unlawful action by Shell or Gallagher. Nor was Haddad's execution of such agreement the result of economic compulsion.

d) From August 15, 1975 through and until May 5, 1976, Haddad operated the Panorama City station pursuant to the agreements described in paragraph 3(b), above.

e) On May 5, 1976, Haddad and Shell entered into a Termination Agreement pur-

suant to which the above-referenced "Dealer Lease" and "Dealer Agreement" concerning the Panorama City station were terminated and pursuant to which Haddad and shell released each other from all claims which each might have against the other arising directly or indirectly under such agreements. On April 28, 1976, Shell had received a letter from Richard P. Carroll, attorney at law, in which Mr. Carroll informed Shell that he was representing Haddad and in which he set forth many of the claims contained in the complaint on file in this action. Therefore, at the time Haddad executed such Termination Agreement he was being represented by Richard P. Carroll attorney at law. Haddad executed such Termination Agreement voluntarily and was not induced to execute such agreement by any threat of unlawful action by Shell or Gallagher. Nor was Haddad's execution of such agreement the result of economic compulsion.

f) At all times prior to and at the time Haddad and Shell entered into the agreements referred to in paragraph 3(b), above, concerning the Panorama City station, Shell intended to convert the Van Nuys station to a "company owned" service station; i. e. one which would be operated by Shell rather than by an independent dealer. It was not until October, 1975, during reconstruction of such station, that Shell determined to retain such station as a dealer operated station. Gallagher made no representations to Haddad concerning the projected volume of the Panorama City station or the income which Haddad could be expected to derive from the operation of the Panorama City station.

4. The following findings of fact relate to Haddad's claims concerning the automobile service stations at 10661 Sepulveda Boulevard, Mission Hills, California, and 17453 Chatsworth Avenue, Granada Hills, California:

a) In March, 1973, Haddad and Shell entered into a written letter agreement pursuant to which Shell agreed to sublease to Haddad an automobile service station at 10661 Sepulveda Boulevard, Mission Hills, California ("Mission Hills station") and provide Shell gasoline and other products to Haddad at such station and Haddad agreed to operate such station as a Shell automobile service station and pay rent to Shell in a specified amount for a term of three months. Such agreement was subsequently amended by a written letter agreement dated June 4, 1973, extending the term of such sublease by one month. Such letter agreements contained no agreement by Shell that it would make Haddad the permanent dealer at such station or provide Haddad a right of first refusal to operate the Mission Hills station in the future. At the time of such agreements, Shell intended to convert the Mission Hills station to a company owned station and during the period July, 1973 to January, 1976, such station was in fact operated as a company owned station.

b) On July 3, 1973, Haddad and Shell entered into a "Termination Agreement" pursuant to which the agreements referred to in paragraph 4(a), above, concerning the Mission Hills station were terminated and pursuant to which Haddad and Shell released each other from all claims which each might have against the other arising directly or indirectly under such agreements. Haddad executed such Termination Agreement voluntarily and was not induced to execute such agreement by any threat of unlawful action by Shell or Gallagher. Nor was Haddad's execution of such agreement the result of economic compulsion.

c) On July 9, 1973, Haddad and Shell entered into a "Dealer Lease" and "Dealer Agreement" pursuant to which Shell agreed to sublease to Haddad an automobile service station at 17453 Chatsworth, Granada Hills, California ("Granada Hills station"), and provide Shell products to Haddad at such station and Haddad agreed to operate the premises as a Shell automobile service station and pay rent to Shell as specified in such agreements for a term of one year. Thereafter, on October 25, 1973 and January 1, 1974, Shell, at Haddad's request, granted reductions in the rent to be paid by Haddad to Shell under such agreements. On June 27, 1974, at Haddad's request, the

above agreements were renewed for a term of one year. Each of such agreements contained an integration clause which provided that such agreements comprised the entire agreement between the parties and merged and superceded all prior agreements, representations and warranties (oral or written, express or implied) between the parties.

d) On July 10, 1975, at Haddad's request, Haddad and Shell agreed to extend the term of the above-referenced agreements concerning the Granada Hills station for an additional two months to September 30, 1975. In September, 1975, at Haddad's request, Shell agreed to sublease such station to Eugene Goldstein, Haddad's partner and business manager, and pursuant to such agreement Haddad vacated the premises and on or about October 1, 1975, Shell and Haddad executed a Termination Agreement, pursuant to which the agreements between Shell and Haddad concerning such station were terminated and pursuant to which Haddad and Shell released each other from all claims which each might have against the other arising directly or indirectly under such agreements. Haddad executed such Termination Agreement voluntarily and was not induced to execute such agreement by any threat of unlawful action by Shell or Gallagher. Nor was Haddad's execution of such agreement the result of economic compulsion.

## CONCLUSIONS OF LAW

1. The agreements which Haddad and Shell executed in connection with the leasing by Haddad of the Van Nuys, Panorama City, Mission Hills and Granada Hills automobile service stations constituted integrated agreements the terms of which cannot be varied by Haddad's allegations of inconsistent oral agreements which preceded or were contemporaneous with the execution of such agreements.

2. Haddad's allegations concerning the circumstances under which he executed the termination agreements with respect to the four automobile service stations referred to in paragraph 1 do not constitute duress as that term is used in California

Civil Code Section 1569 or economic or business compulsion.

3. Haddad's allegations concerning the circumstances under which he executed the above-referenced termination agreements do not constitute sufficient allegations that the execution of such agreements were induced by fraud on the part of Shell or Gallagher.

4. The foregoing findings of fact preclude a finding that Haddad's executions of the subject termination agreements were induced by Shell's or Gallagher's fraud.

5. The foregoing findings of fact preclude a finding that Haddad's executions of the subject termination agreements were the result of duress or economic or business compulsion.

6. The termination agreements referred to above bar all causes of action asserted by Haddad against Shell in the complaint on file herein.

7. Gallagher, in all of his dealings with Haddad, was acting in the course and scope of his capacity as an employee and duly authorized agent of Shell.

8. Gallagher cannot be held liable on a contract made in the name of Shell, his principal.

9. The gravamen of Haddad's complaint against Shell and Gallagher is that Shell and Gallagher breached contracts that existed between Shell and Haddad. All of the causes of action asserted by Haddad against Shell and Gallagher arise out of and relate to the contractual arrangements between Haddad and Shell. By reason thereof, Haddad's causes of action against Gallagher do not state claims upon which relief can be granted against Gallagher.

10. The allegations of Haddad in his cause of action for intentional infliction of emotional distress do not state a claim upon which relief can be granted against Shell or Gallagher.

11. The alleged oral agreements made by Shell and Gallagher are within the California Statute of Frauds and are thus unenforceable.

12. Gallagher cannot be held to have conspired with Shell while acting in the course and scope of his official and duly authorized capacity as an employee and agent of Shell.

13. By reason of the foregoing findings of fact and conclusions of law, plaintiffs Sami S. Haddad and Geraldine Haddad are not entitled to any relief against Shell or Gallagher or either of them under any of the causes of action in their complaint.